ROBERT V. SQUEGLIA, JR. *v.* ROBERT V. SQUEGLIA, SR.
(15041)

CALLAHAN, BERDON, NORCOTT, KATZ and PALMER, Js.

Argued April 27—decision released July 18, 1995

*David R. Babbitz,* with whom, on the brief, was *Vincent R. Falcone,* for the appellant (plaintiff).

*David J. Crotta, Jr.,* with whom, on the brief, was *Carolyn P. Gould,* for the appellee (defendant).

KATZ, J. The dispositive issue in this appeal is whether the doctrine of parental immunity bars an action by an unemancipated minor against his parent alleging strict liability pursuant to General Statutes § 22-357.[1] We conclude that it does.

---

[1] General Statutes § 22-357 provides: "DAMAGE TO PERSON OR PROPERTY. If any dog does any damage to either the body or property of any person, the owner or keeper, or, if the owner or keeper is a minor, the parent or guardian of such minor, shall be liable for such damage, except when such damage has been occasioned to the body or property of a person who, at the time such damage was sustained, was committing a trespass or other

The relevant facts are few and undisputed. The defendant, Robert V. Squeglia, Sr., owned a dog that attacked and injured the plaintiff, Robert V. Squeglia, Jr., in 1991. The plaintiff, who is the son of the defendant, was four years old at the time of the injury.

In October, 1991, the plaintiff brought this action[2] against the defendant pursuant to § 22-357, seeking damages for personal injuries. The defendant moved for summary judgment, claiming that the action was barred by the doctrine of parental immunity. The plaintiff argued, however, that although the doctrine of parental immunity generally bars actions in negligence, it does not bar an action in strict liability brought under § 22-357.

In its memorandum of decision on the defendant's motion for summary judgment, the trial court first noted that, with limited exceptions that have been strictly construed, the doctrine of parental immunity bars an unemancipated minor from bringing an action in tort against his or her parent. The court determined that the doctrine is not limited to actions alleging negligence and that the reasoning underlying the doctrine of parental immunity applies equally to actions alleging strict liability pursuant to § 22-357. Because there was no genuine issue of material fact regarding the parentage of the plaintiff or the ownership of the dog, the trial court concluded that the doctrine of parental immunity barred the plaintiff's action and granted the defendant's motion for summary judgment.[3]

tort, or was teasing, tormenting or abusing such dog. If a minor, on whose behalf an action under this section is brought, was under seven years of age at the time the damage was done, it shall be presumed that such minor was not committing a trespass or other tort, or teasing, tormenting or abusing such dog, and the burden of proof thereof shall be upon the defendant in such action."

[2] The action was commenced by Claudia Squeglia, the plaintiff's mother and next friend.

[3] "Pursuant to Practice Book § 384, summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show

The plaintiff appealed from the judgment of the trial court to the Appellate Court, claiming that the trial court had improperly determined that the defendant was entitled to judgment as a matter of law on the basis of the doctrine of parental immunity. The Appellate Court affirmed the judgment of the trial court. *Squeglia v. Squeglia,* 34 Conn. App. 866, 644 A.2d 378 (1994). We granted certification to appeal from the judgment of the Appellate Court on the issue of whether the Appellate Court properly held that the doctrine of parental immunity shields a parent from an action for damages in strict liability pursuant to § 22-357 brought by that parent's unemancipated minor child. *Squeglia v. Squeglia,* 231 Conn. 920, 648 A.2d 162 (1994).

Although this court, and the Connecticut General Assembly, have articulated the parameters of the doctrine of parental immunity in Connecticut in the context of claims of negligence and, to a limited extent, intentional tort, we have not heretofore determined whether the doctrine bars an action in strict liability pursuant to § 22-357. Therefore, the case presents an issue of first impression for this court.

"Initially, we note that, upon the granting of certification . . . the focus of our review is not the judgment of the trial court but the judgment of the Appellate Court." (Internal quotation marks omitted.) *Thompson & Peck, Inc.* v. *Harbor Marine Contracting Corp.,* 203 Conn. 123, 128, 523 A.2d 1266 (1987). In the present case, therefore, we must determine only whether the Appellate Court properly concluded that

---

that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . . In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The test is whether a party would be entitled to a directed verdict on the same facts." (Citations omitted; internal quotation marks omitted.) *Suarez* v. *Dickmont Plastics Corp.,* 229 Conn. 99, 105–106, 639 A.2d 507 (1994).

the doctrine of parental immunity barred the plaintiff's action and affirmed the trial court's decision granting summary judgment to the defendant. Because the issue of whether the Appellate Court properly interpreted the common law doctrine of parental immunity is a question of law our review is de novo. See *Andover Ltd. Partnership I* v. *Board of Tax Review*, 232 Conn. 392, 396, 655 A.2d 759 (1995) (statutory interpretation is question of law requiring de novo review).

The plaintiff first argues, on the basis of the cases that have concluded that the doctrine of parental immunity bars a claim of parental negligence by an unemancipated child; see *Dubay* v. *Irish*, 207 Conn. 518, 542 A.2d 711 (1988); *Ooms* v. *Ooms*, 164 Conn. 48, 316 A.2d 783 (1972); *Begley* v. *Kohl & Madden Printing Ink Co.*, 157 Conn. 445, 254 A.2d 907 (1969); that, because the doctrine has never been extended to any other action in tort, it applies only to actions alleging negligence. We disagree.

The doctrine of parental immunity, first recognized in *Hewlett* v. *George*, 68 Miss. 703, 9 So. 885 (1891), overruled in part by *Glaskox* v. *Glaskox*, 614 So. 2d 906 (Miss. 1992), "forbid[s] to the minor child a right to appear in court in the assertion of a claim to civil redress for personal injuries suffered at the hands of the parent." *Hewlett* v. *George,* supra, 711. The doctrine was not limited to negligence in *Hewlett*, and was subsequently interpreted to apply to *any* personal injury claim by a minor child against his or her parent. See *McKelvey* v. *McKelvey*, 111 Tenn. 388, 77 S.W. 664 (1903) (doctrine of parental immunity bars child's tort action against parent for cruel and unusual treatment), overruled in part by *Davis* v. *Davis*, 657 S.W.2d 753 (Tenn. 1983), and overruled in part by *Broadwell* v. *Holmes*, 871 S.W.2d 471 (Tenn. 1994); *Roller* v. *Roller*, 37 Wash. 242, 79 P. 788 (1905) (doctrine of parental immunity bars child's tort action against

father for sexual assault), overruled in part by *Borst* v. *Borst*, 41 Wash. 2d 642, 251 P.2d 149 (1952).

In *Mesite* v. *Kirchenstein*, 109 Conn. 77, 145 A. 753 (1929), this court first recognized the doctrine and, citing to *Hewlett* v. *George*, supra, 68 Miss. 711, stated that "[a]uthority in the parent to require obedience in the child is indispensable to the maintenance of unity in the family. Anything which undermines this authority, brings discord into the family, weakens its government and disturbs its peace, is an injury to society and to the State. Few things could bring about this unhappy condition more quickly or widen the breach between parent and child further than the *bringing of an action at law for personal injuries* by a minor child against the parent. Such unseemly family discord is injurious to the public welfare . . . ." (Emphasis added.) *Mesite* v. *Kirchenstein*, supra, 84. The doctrine was not, therefore, initially limited in Connecticut to actions in negligence.

Because the doctrine of parental immunity is a judicially created doctrine, we may modify it. *Dzenutis* v. *Dzenutis*, 200 Conn. 290, 301, 512 A.2d 130 (1986).[4] We will create a new exception, however, only if, in

[4] The legislature has clearly recognized the doctrine and has chosen to abrogate it, in derogation of the common law, only in the case of the negligent operation of a motor vehicle, aircraft or vessel. General Statutes § 52-572c; see footnote 5. It is well established that statutes that are in derogation of the common law must be strictly construed. *Scrapchansky* v. *Plainfield*, 226 Conn. 446, 468 n.6, 627 A.2d 1329 (1993); *Copeland* v. *Warden*, 225 Conn. 46, 53, 621 A.2d 1311 (1993); *State* v. *Nugent*, 199 Conn. 537, 548, 508 A.2d 728 (1986). " 'The rule that statutes in derogation of the common law are strictly construed can be seen to serve the same policy of continuity and stability in the legal system as the doctrine of stare decisis in relation to case law.' " *Lynn* v. *Haybuster Mfg., Inc.*, 226 Conn. 282, 290, 627 A.2d 1288 (1993), quoting 3 J. Sutherland, Statutory Construction (5th Ed. Singer 1992 Rev.) § 61.01, pp. 172–73. The legislature has not abrogated the doctrine as to § 22-357 because there is no statutory exception to the general bar against actions by an unemancipated minor child against a parent for claims alleging strict liability under § 22-357.

light of the purpose of the doctrine, we determine that one is appropriate under the circumstances and accords with public policy considerations. Id.

We have modified the doctrine of parental immunity in several respects since *Mesite*. The modern doctrine in Connecticut only bars actions by minors who were unemancipated at the time of the alleged tortious conduct. See *Wood* v. *Wood*, 135 Conn. 280, 281, 63 A.2d 586 (1948). Furthermore, the doctrine does not bar an action by an unemancipated child against a parent for injuries received because of: (1) the negligent conduct of the parent at a business enterprise located outside of the home; *Dzenutis* v. *Dzenutis*, supra, 200 Conn. 300; (2) the negligent operation of a motor vehicle, aircraft or waterborne vessel; General Statutes § 52-572c;[5] or (3) sexual abuse, sexual assault or sexual exploitation. *Henderson* v. *Woolley*, 230 Conn. 472, 486, 644 A.2d 1303 (1994). Otherwise, the doctrine, as adopted in *Mesite*, remains unchanged, and it has never been limited to actions in negligence. See *Dubay* v. *Irish*, supra, 207 Conn. 523 (parent is not liable civilly to his child for personal injury inflicted during child's minority); *Begley* v. *Kohl & Madden Printing Ink Co.*, supra, 157 Conn. 449–50.

The purpose of the doctrine is to preserve the integrity and unity of the family and to avoid unnecessarily injecting "the machinery of the state" into the day-to-day exercise of parental discretion. *Dubay* v. *Irish*, supra, 207 Conn. 527–28. As we noted in *Mesite* v. *Kirchenstein*, supra, 109 Conn. 84, there are few things

[5] General Statutes § 52-572c provides: "PARENT-CHILD IMMUNITY ABROGATED IN CERTAIN NEGLIGENCE ACTIONS. In all actions for negligence in the operation of a motor vehicle, and in all actions accruing on or after October 1, 1979, for negligence in the operation of an aircraft or vessel, as defined in section 15-127, resulting in personal injury, wrongful death or injury to property, the immunity between parent and child in such negligence action brought by a parent against his child or by or on behalf of a child against his parent is abrogated."

more disruptive of familial harmony than a legal action by an unemancipated minor child against a parent. There is no reason to believe that an action in strict liability would be less disruptive to these interests than any other civil action for personal injuries brought by an unemancipated child against a parent. Therefore, as the Appellate Court noted, the purpose of the doctrine is equally applicable to an action alleging strict liability pursuant to § 22-357.

We have previously considered several factors when deciding whether to abrogate the doctrine. We have abrogated the doctrine in circumstances in which the parent had acted in a nonparental capacity; *Dzenutis v. Dzenutis*, supra, 200 Conn. 300; and in which the heinous nature of the parent's misconduct had already destroyed familial harmony. *Henderson v. Woolley*, supra, 230 Conn. 482. In both *Dzenutis* and *Henderson* we evaluated whether the parent had breached a duty owed to the public at large; *Henderson v. Woolley*, supra, 482–83; *Dzenutis v. Dzenutis*, supra, 300;[6] and examined public policy considerations. *Henderson v. Woolley*, supra, 483.[7] We also considered the likely availability of insurance coverage; *Dzenutis v. Dzenutis*, supra, 300; and whether the alleged act had occurred at the parent's place of business outside the home. Compare id., 299–300 (permitting action arising out of business activity away from home), with *Dubay v. Irish*, supra, 207 Conn. 525 (action barred

---

[6] In *Dzenutis*, the defendant parent had negligently left a bucket of hot tar, which injured the plaintiff, in a public area. We determined that the defendant had breached a duty to the public at large by creating the hazard in an area with public access. *Dzenutis v. Dzenutis*, supra, 200 Conn. 300. In *Henderson v. Woolley*, supra, 230 Conn. 482–83, we found that the perpetration of a crime by a parent upon a child is a matter of public concern.

[7] In *Henderson v. Woolley*, supra, 230 Conn. 483, we found that extending immunity from civil action to a parent who allegedly had sexually assaulted his child would be contrary to public policy.

where alleged acts occurred within family home). None of the factors we have considered support abrogating the doctrine in this case.

The plaintiff also argues that the doctrine of parental immunity should not bar this action because insurance coverage is available and because § 22-357 imposes a duty owed to the public at large. At oral argument, the plaintiff contended that, as a practical matter, actions against a parent by an unemancipated child under § 22-357 will be commenced only if there is insurance coverage. Even if we assume, arguendo, that the plaintiff's factual contention is correct, his reliance on the existence of insurance as a basis for discarding the doctrine is misplaced as a matter of both law and public policy.

In *Dzenutis* v. *Dzenutis*, supra, 200 Conn. 290, after having considered both the availability of insurance and the public nature of the duty involved, we declined to apply the parental immunity doctrine in situations involving tortious conduct by a parent arising out of business activities conducted away from home. In that case, the plaintiff had been severely burned when he tripped over a bucket of hot tar that his father, the defendant, had left unguarded on the sidewalk adjacent to the building upon which he was working. We based our decision on three factors. First, we determined that liability insurance was prevalent in the defendant's line of business, which involved repairing buildings. We qualified this, however, by stating that the presence of insurance should not be "the touchstone of viability of an action by a child against a parent . . . ." Id., 299. Second, we determined that "in most instances family harmony will not be jeopardized by allowing suits between parents and children arising out of business activities conducted away from the home . . . ." Id., 299–300. Finally, we stated that the duty breached was owed to the public generally because

"[t]he mishap might well have occurred to any other member of the public who passed that way." Id., 300. Therefore, the potential availability of homeowner's insurance is not dispositive of his case. Id., 299; see *Dubay* v. *Irish,* supra, 207 Conn. 524.

Furthermore, determining rights based upon the availability of insurance is unsound. The plaintiff has pointed only to the general availability of insurance and has provided no hard evidence that homeowner's insurance is prevalent. Notably, there is no statutory requirement that such insurance must be maintained. Indeed, it is reasonable to assume, and the plaintiff does not argue otherwise, that many households in Connecticut are not protected by homeowner's insurance and that insured households tend to be more affluent than households that are uninsured. The defendant cautions that, because the uninsured would be personally liable for any judgment and, in the case of the uninsured poor, the injured child would be less likely to bring an action in the first instance because any judgment would be uncollectible, abrogation of the doctrine in this type of case would likely benefit only insured persons and their unemancipated minor children. We agree with the defendant that eliminating the doctrine under circumstances present in this case could improperly result in disproportionate benefits and burdens on those who are insured and those who are not. See *Dubay* v. *Irish,* supra, 207 Conn. 524 (different rules of law should not be fashioned for insured and uninsured). We conclude, therefore, that the availability of insurance lends little weight to the claim that the doctrine of parental immunity should be jettisoned in this case.

Finally, it is undisputed that the plaintiff was injured at the family home. This is significant for two reasons. First, the dog was in the home and posed no menace to the general public, as did the can of hot tar on the

sidewalk in *Dzenutis* and the alleged criminal conduct of the defendant in *Henderson*. Second, we have recognized that the doctrine of parental immunity is particularly applicable in the area of parental supervision and discretion with respect to the care and control of a minor child. *Henderson* v. *Woolley*, supra, 230 Conn. 480; *Dubay* v. *Irish*, supra, 207 Conn. 527; see also W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 122, p. 908. "Even in those jurisdictions that have, in part, abrogated parental immunity . . . the overwhelming majority of them have specifically retained the doctrine in the area of parental supervision, or have at least recognized that the doctrine may have continued validity where the negligent act involves the exercise of ordinary parental discretion with respect to the care and control of a minor child. . . . The supervision, care and instruction of one's child involves issues of parental control, authority and discretion that are uniquely matters of a very personal type. Each parent has unique and inimitable methods and attitudes on how children should be supervised. Likewise, each child requires individualized guidance depending on intuitive concerns which only a parent can understand. Also, different cultural, educational and financial conditions affect the manner in which different parents supervise their children." (Citations omitted; internal quotation marks omitted.) *Dubay* v. *Irish*, supra, 526–27.

The decision to maintain a dog in the home is an example of parental discretion, and permitting a minor child to be exposed to the dog is within the parental supervisory function. This maintenance of the home environment typifies the day-to-day exercise of parental discretion that the state would rather not disrupt. Consequently, this action by an unemancipated minor child, who had been injured as a result of his parent's decision to keep a dog in the home and expose the child

to it, falls directly within the scope of claims the doctrine is intended to bar.[8]

In sum, we conclude that the plaintiff is barred by the doctrine of parental immunity from bringing an action in strict liability pursuant to § 22-357. Thus,

[8] Our research reveals only three instances in which a state appellate court considered the doctrine of parental immunity in connection with a statute imposing strict liability. The plaintiff cites *Schleier* v. *Alter*, 159 Ariz. 397, 767 P.2d 1187 (1989), for the proposition that the parental immunity doctrine does not extend to a strict liability dog bite statute because the statute imposed a duty to a large protected class. We disagree with the plaintiff's interpretation of this case. The Arizona dog bite statutes provide a cause of action in strict liability to a person "lawfully in or on . . . the property of the owner of the dog." Id., 401. The statutes further define such a person as an invitee or guest or person performing a federal, state or municipal governmental duty. Id., 402. This definition did not include family members and the court found the omission to be intentional. Therefore, because the plaintiff child had no cause of action under the statute, the court upheld the lower court's decision to grant summary judgment on that basis. Id., 401–402. Other appellate cases in which the doctrine of parental immunity has been raised as a defense to a strict liability tort claim are distinguishable from the case before us. In *Thelen* v. *Thelen*, 174 Mich. App. 380, 435 N.W.2d 495 (1989), the plaintiff was the unemancipated minor child of the defendant father and the stepchild of the defendant stepmother. The plaintiff had been bitten by the defendants' dog and he sued the defendants under the Michigan dog bite statute, which provides for strict liability. The court determined that the doctrine of parental immunity does not bar such an action. Id., 386. *Thelen* is distinguishable from the case before us because the doctrine of parental immunity had been abrogated in Michigan except "(1) where the alleged *negligent* act involves an exercise of reasonable parental authority over the child; and (2) where the alleged *negligent* act involves an exercise of reasonable parental discretion with respect to the provision of food, clothing, housing, medical and dental services, and other care." (Emphasis added.) *Plumley* v. *Klein*, 388 Mich. 1, 8, 199 N.W.2d 169 (1972). In *Thelen*, although the court determined that keeping a dog in the home falls squarely within "the parental maintenance of the home environment," the court narrowly construed the *Plumley* exceptions and held that the doctrine was strictly limited to negligent acts. *Thelen* v. *Thelen*, supra, 385–86. In contrast, as we previously discussed, the doctrine has not been limited to negligence in Connecticut. See also *Ankiewicz* v. *Kinder*, 408 Mass. 792, 793, 563 N.E.2d 684 (1990) (after complete abrogation of doctrine, permitting landlord's third party complaint for contribution against parent in strict liability action for lead paint poisoning of child).

because there was no genuine issue of material fact, the Appellate Court properly affirmed the trial court's decision to grant the defendant's motion for summary judgment.[9]

The judgment of the Appellate Court is affirmed.

In this opinion CALLAHAN, NORCOTT and PALMER, Js., concurred.

BERDON, J., dissenting. The majority, which holds that the doctrine of parental immunity bars a child's action against his parent that is grounded in statutory strict liability, stretches this doctrine beyond all previous limits and arrives at a result that apparently no other court has reached. In so doing, the majority deprives the plaintiff, who was four years old at the time he was attacked by his father's dog, of any compensation for the permanent facial scars he suffered.

I

In order to understand the current status of the doctrine of parental immunity, which "bars an unemancipated minor from suing his or her parent for injuries caused by the *negligence* of that parent"; (emphasis added) *Dubay* v. *Irish*, 207 Conn. 518, 523, 542 A.2d 711 (1988); we must begin with an historical analysis.

_____

[9] Our holding in this case is intentionally narrow. In reaching our decision, we have evaluated the circumstances of this particular case according to the established criteria for evaluating whether the doctrine of parental immunity should apply. We believe that to abrogate the doctrine merely because § 22-357 imposes strict liability would, in effect, swallow the doctrine.

We recognize that if we were to apply the criteria for determining whether the doctrine of parental immunity bars an action at law to another dog bite case, we potentially could reach a different result. For example, if an unemancipated minor were bitten by a guard dog in a public area at the parent's place of business, our reasoning in *Dzenutis* could lead to a different outcome. We leave that, and other hypothetical scenarios, for another day.

"It seems that the common law did not forbid actions for personal torts by children against their parents until the Mississippi court[1] so held in 1891." 2 F. Harper, F. James & O. Gray, Torts (2d Ed. 1986) § 8.11, p. 573. As Professors Prosser and Keeton explained, "American courts adopted a general rule refusing to allow actions between parent and minor child for personal torts, whether they are *intentional or negligent* in character." (Emphasis added.) W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 122, p. 904.

This court first recognized the doctrine of parental tort immunity in 1929 in *Mesite* v. *Kirchenstein,* 109 Conn. 77, 145 A. 753 (1929). In that case, the plaintiff child alleged that her mother's husband had driven the family car negligently and had caused an accident that resulted in the child's injuries. This court held that the doctrine of parental immunity barred such an action. "Anything which undermines this authority, brings discord into the family, weakens its government and disturbs its peace, is an injury to society and to the State. Few things could bring about this unhappy condition more quickly or widen the breach between parent and child further than the bringing of an action at law for personal injuries by a minor child against the parent. Such unseemly family discord is injurious to the public welfare, to such a degree that all the courts of this country, which have had occasion to express their opinion upon the right of the minor to maintain such an action, have declared that the exercise of this right is against sound public policy." Id., 84.

These early applications of the doctrine were based primarily on the public policy ground that a child simply should not be allowed to sue a parent for negligence, regardless of the precise theory of liability. "Although other arguments are occasionally invoked to support

---

[1] The Mississippi case is *Hewlett* v. *George,* 68 Miss. 703, 9 So. 885 (1891).

the orthodox rule that no such action may be maintained, the domestic harmony policy is the one most frequently offered." 2 F. Harper, F. James & O. Gray, supra, § 8.11, p. 574.

In the middle of this century, however, courts began to recognize that an absolute bar was not a sound policy and narrowed the circumstances in which the doctrine should be applied. "Finally, in 1963, Wisconsin took the lead in declaring that the parent-child immunity was abrogated entirely in that jurisdiction, except as to exercises of parental control and authority, or parental discretion with respect to such matters as food and care. The decision[2] set off something of a long-overdue landslide; and at the present writing more than half the states have now abrogated the absolute immunity, either by case law or by statute. In a few instances courts have, at least as a first step, limited family liabilities to those cases in which insurance exists or is likely [to exist] . . . ." W. Prosser & W. Keeton, supra, § 122, p. 907.

Most of these courts did not choose to abrogate the doctrine entirely. Rather, they retained the doctrine of parental immunity to bar only those cases in which the child alleged that the parent had negligently supervised the child or had failed to exercise reasonable parental discretion. A child, however, was free to maintain actions based on other theories of negligence that did not involve uniquely parental responsibilities. The Michigan Supreme Court's holding was typical of this line of cases: "A child may maintain a lawsuit against his parents for injuries suffered as a result of the alleged ordinary negligence of the parent. Like our sister states, however, we note two exceptions to this new rule of law: (1) where the alleged negligent act involves

---

[2] The Wisconsin case is *Goller* v. *White*, 20 Wis. 2d 402, 122 N.W.2d 193 (1963).

an exercise of reasonable parental authority over the child; and (2) where the alleged negligent act involves an exercise of reasonable parental discretion with respect to the provision of food, clothing, housing, medical and dental services, and other care." *Plumley* v. *Klein*, 388 Mich. 1, 8, 199 N.W.2d 169 (1972). Likewise, the American Law Institute made clear in the Restatement (Second) of Torts that "[i]f the conduct giving rise to an injury does not grow directly out of the family relationship, the existence of negligence may be determined as if the parties were not related." 4 Restatement (Second), Torts § 895G, comment (k), p. 430 (1979).

This court followed this same pattern. Beginning in 1986, we began to carve out exceptions to the doctrine. In *Dzenutis* v. *Dzenutis*, 200 Conn. 290, 295, 512 A.2d 130 (1986), we acknowledged that "[t]he history of the rise and decline of parent-child immunity nationwide has generally paralleled its course in this state," and considered whether the doctrine should bar a child from suing his parent for injuries received as a result of his parent's negligence in the conduct of a business enterprise. Concluding that "the doctrine no longer serves the purposes for which it was designed," we proceeded to "modify the breadth of our decisions in previous cases that have unconditionally endorsed parental immunity as a defense to a *negligence* suit by a child." (Emphasis added.) Id., 291. We concluded in *Dzenutis* that when the negligence of the parent occurs at the parent's place of business, the doctrine of parental immunity should not apply.

Two years later, we again considered the viability of the doctrine. In *Dubay* v. *Irish*, supra, 207 Conn. 520–21, we weighed a claim that a mother's negligence in keeping medications in her house had caused her daughter's drug overdose. Although we expressly recognized that many jurisdictions had done away with

the defense of parental immunity for causes of action based on ordinary negligence, "the overwhelming majority of them have specifically retained the doctrine in the area of parental supervision, or have at least recognized that the doctrine may have continued validity where the negligent act involves the exercise of ordinary parental discretion with respect to the care and control of a minor child." Id., 526. Accordingly, we declined "to abrogate the doctrine of parental immunity in cases . . . involving allegations of the negligent exercise of parental discretion with regard to the care, supervision and instruction of a child based solely upon the existence of liability insurance. Courts should not unnecessarily involve themselves in the day-to-day exercise of parental discretion regarding the upbringing and care of children. To do so would undermine parental authority in the very personal endeavor of child rearing and inject the machinery of the state into an area where its presence might be the occasion for family discord." Id., 527–28.

We further circumscribed the doctrine in *Henderson* v. *Woolley*, 230 Conn. 472, 644 A.2d 1303 (1994). In that case, a parent attempted to use the doctrine as a shield against his daughter's claims that he had sexually abused her. Id., 482. We explained that the rationale for retaining parental immunity in cases of negligent parental supervision—the difficulty of determining the proper standard of care to apply to raising and supervising a child—had no application in cases of intentional sexual abuse. "When a parent perpetrates such a crime upon his or her child, that act constitutes *a breach of duty owed not only to the child, but to the public at large,* and there is no reason to immunize such conduct from a civil action in damages merely because of the familial relationship." (Emphasis added.) Id., 483.

## II

This history helps to bring into sharp focus the weaknesses in the reasoning of the majority. The majority not only mischaracterizes the breadth of the doctrine, but also misapplies the doctrine as it has evolved since 1986.

First, the majority fails to recognize that by holding that parental immunity does not apply to strict tort liability, it would not be creating "a new exception" to the immunity. Rather, the court merely would be refusing, quite properly, to extend beyond all previous limits a historically narrow doctrine. The majority, however, takes the position that "[t]he doctrine was not . . . initially limited in Connecticut to actions in negligence," and that the doctrine of parental immunity applies to all tort actions by a child against his parent, regardless of the theory of liability, unless this court has created an exception. This misrepresents the history of the doctrine. We have repeatedly stated that the doctrine applies *only* to actions sounding in negligence. See, e.g., *Dubay* v. *Irish*, supra, 207 Conn. 523; *Dzenutis* v. *Dzenutis*, supra, 200 Conn. 291. I can find no case, and the majority cites to none, in which this court applied the doctrine to bar a cause of action that was *not* grounded in negligence.

Indeed, by holding that the doctrine of parental immunity bars a child's action against his parent that is grounded in strict liability, the majority stretches the doctrine beyond all previous limits and arrives at a result that apparently no other court has reached. I can find no case from any jurisdiction, and the majority again cites to none, in which the court applied the doctrine to block a cause of action grounded in strict tort liability. On the contrary, courts that have considered the issue have held that a cause of action for which the

legislature has imposed strict liability is *not* barred by the doctrine of parental immunity.

In *Thelen* v. *Thelen*, 174 Mich. App. 380, 435 N.W.2d 495 (1989),[3] the Michigan Court of Appeals considered a case in which the facts are virtually identical to the facts presented here. The Michigan dog bite statute, like that of Connecticut, imposed strict liability on the owner of a dog that caused injury to a person.[4] The Michigan Court of Appeals indicated that in the absence of a statute imposing strict liability, parental immunity would clearly apply, because the "complaint is clearly based on parental maintenance of the home environment, in that defendants allowed the home to be occupied by an 'unleashed and roaming' dog." Id., 385. The court, however, concluded that the statutory strict liability trumped the doctrine of parental immunity. "The statute places absolute liability on the dog owner, except when the dog bites after having been provoked. . . . [I]t appears that in enacting a dog-bite statute which imposes strict liability on the owner, the Legislature intended 'provocation' to be the only defense to a strict liability claim. . . . We therefore hold that parental immunity does not bar dog-bite suits based on [the statute]. In view of the Legislature's determination that dog owners will be liable to persons injured while 'lawfully on or in a public place, including the property of the owner of the dog,' we see no sound rea-

---

[3] The majority, in footnote 8, attempts to distinguish *Thelen* v. *Thelen*, supra, 174 Mich. App. 380, by pointing out that the Michigan courts have applied parental immunity only to actions sounding in negligence. As I demonstrate and previously stated in this dissent, however, courts in this state, like those in Michigan, also have applied parental immunity only to actions sounding in negligence.

[4] The Michigan statute provides in pertinent part: "If a dog bites a person, without provocation while the person is on public property, or lawfully on private property, including the property of the owner of the dog, the owner of the dog shall be liable for any damages suffered by the person bitten, regardless of the former viciousness of the dog or the owner's knowledge of such viciousness." Mich. Stat. Ann. § 12.544 (1) (1995).

son to deny recovery on the basis of the parties' familial relationship." Id., 385–87.[5] This same logic applies to this case, and we therefore ought to hold that parental immunity, which has historically been limited in this state to cases grounded in negligence, has no application to a cause of action, established by the legislature, that imposes strict liability.

Second, even if parental immunity is not limited to negligence and applies also to all other tort causes of action, the majority fails to recognize that the facts of this case do not fit the doctrine as it has evolved throughout the country and in this state since 1986. In *Dzenutis* v. *Dzenutis*, supra, 200 Conn. 296–301, we identified three factors that are relevant to whether the doctrine should block a child's cause of action against a parent. These factors are: (1) whether the alleged negligent conduct of the parent was a matter of parental discretion; (2) whether the duty breached was owed to the public generally or only to the child; and (3) whether insurance likely existed to cover such a loss. All of these factors counsel against applying parental immunity to bar the child's action in this case.

Our cases since 1986 have recognized that the principal rationale for retaining parental immunity in negligence cases has to do with the difficulty in determining the proper standard of care applicable to the raising or supervision of a child. As Professors Prosser and Keeton point out, "[c]ourts apparently feel that the jury should not be permitted to second-guess the parent as to the exact amount of supervision, training or free-

---

[5] The Superior Court of New Jersey reached exactly the same result in *Dower* v. *Goldstein*, 143 N.J. Super. 418, 363 A.2d 373 (1976), which was cited with approval by the Michigan Court of Appeals in *Thelen*. The facts in *Dower*, too, were virtually identical to those in the present case. The court concluded that the strict liability statute established a cause of action that "was legislatively granted and entitled to liberal interpretation. . . . [W]e see no sound reason to deny that recovery on the basis of the litigants' familial relationship." Id., 422.

dom a child should have . . . ." W. Prosser & W. Keeton, supra, § 122, p. 908. Indeed, it was for this reason that in *Dubay* v. *Irish*, supra, 207 Conn. 527–28, we declined to abrogate the immunity in cases "involving allegations of the negligent exercise of parental discretion with regard to the care, supervision and instruction of a child based solely upon the existence of liability insurance."

This case, however, has absolutely nothing to do with parental discretion or the scope of the standard of care owed by the parent. Although the majority suggests that the "decision to maintain a dog in the home is an example of parental discretion, and permitting a minor child to be exposed to the dog is within the parental supervisory function," this argument has been summarily rejected by at least one appellate court. The Arizona Court of Appeals concluded that "[w]hile it might fall within the immunized sphere of parental discretion to set the bounds of access to animals by one's child, such immunity dissolves when one sets the bounds of access to children by one's dog. The actionable breach in this case was not the failure to curb the child but the failure to curb the dog . . . ." *Schleier* v. *Alter*, 159 Ariz. 397, 400, 767 P.2d 1187 (1989).[6]

---

[6] Contrary to the assertion of the majority, the Arizona Court of Appeals in *Schleier* did indicate that the doctrine of parental immunity would not bar a child's action against a parent that is grounded in strict liability. In *Schleier*, the child's conservator sued the parents under both common law theories and the strict liability statute. The Arizona Court of Appeals first concluded that parental immunity did not bar the common law actions. The court then went on to consider the statutory cause of action. After determining that the statutory definition did not include family members within the classes of persons who could maintain such an action, the court declined to allow the statutory cause of action. The court, however, expressly stated that *"[i]f we were to accept the further assumption that [the child], a family member bitten by the family dog in the family home, came within the class of persons protected by [the statute], we would hold parental immunity inapplicable in this case . . . ."* (Emphasis added.) *Schleier* v. *Alter*, supra, 159 Ariz. 401.

This is a case in which the legislature, by enacting a statute imposing strict liability, has relieved the plaintiff of the burden of proving an applicable standard of care and a breach of that standard. General Statutes § 22-357[7] requires only that a dog bite a person for the dog's owner to be liable. That is exactly what happened in this case. He should, therefore, be held to the same standard of liability as every other dog owner.

Similarly, the duty breached was not one that was owed solely to the child, but one that was owed generally to the public. Section 22-357 imposes strict liability on a person whose dog bites another person. The statute does not differentiate between classes of persons who are bitten. By holding a parent to the terms of the statute and exposing him to legal action, we are not imposing upon him any greater liability merely because that legal action is being brought by his own child. As the Arizona Supreme Court recognized in *Schleier* v. *Alter*, supra, 159 Ariz. 400, "[t]he defendants—not as parents but as dog-owners—owed the duty to the world at large to isolate that instrumentality from all children including their own. To the violation of that duty, no immunity attached."

Finally, the existence of insurance in this case also weighs against the application of parental immunity.[8]

[7] General Statutes § 22-357 provides: "DAMAGE TO PERSON OR PROPERTY. If any dog does any damage to either the body or property of any person, the owner or keeper, or, if the owner or keeper is a minor, the parent or guardian of such minor, shall be liable for such damage, except when such damage has been occasioned to the body or property of a person who, at the time such damage was sustained, was committing a trespass or other tort, or was teasing, tormenting or abusing such dog. If a minor, on whose behalf an action under this section is brought, was under seven years of age at the time the damage was done, it shall be presumed that such minor was not committing a trespass or other tort, or teasing, tormenting or abusing such dog, and the burden of proof thereof shall be upon the defendant in such action."

[8] The majority argues that insurance should not be a factor because "many households in Connecticut are not protected by homeowner's insurance . . . ." There is no basis in the record for this kind of speculation. Indeed,

Here, the parent is covered by homeowner's insurance, which will cover the loss. Thus, there is no danger that the parent will be faced with the unwelcome "prospect of greeting an adolescent judgment creditor at the dinner table each day . . . ." *Dzenutis* v. *Dzenutis*, supra, 200 Conn. 296. Similarly, there is no danger that a judgment of the child would deplete the assets that the parent needs to take care of the other members of his family. Id., 296–97. Because there is liability insurance, therefore, there is no need for this court to protect the parent from these perils.

I respectfully dissent.

in *Dzenutis* v. *Dzenutis*, supra, 200 Conn. 299, we stated that we need only consider "the *likely availability* of insurance coverage in particular situations . . . ." (Emphasis added.) For example, in that case, the principal basis for our decision to abrogate parental immunity in situations where a child is injured at a parent's place of business was the "general prevalence of liability insurance in the business activities setting." Id., 297. We did not require the parties to present proof and statistics regarding how many people or businesses had actually *obtained* insurance, nor is there any indication from our opinion in that case that the parties did so. In rejecting the argument of the plaintiff in this case because he "has pointed *only to the general availability of insurance* and has provided no hard evidence that homeowner's insurance is *prevalent*," the majority appears to have rejected the principal basis for our decision in *Dzenutis*.